901 So.2d 1117 (2005)
Joseph GREFER, Camille Grefer, Rose Marie Grefer Hassi and Henry Grefer
v.
ALPHA TECHNICAL, et al.
No. 2002-CA-1237.
Court of Appeal of Louisiana, Fourth Circuit.
March 31, 2005.
Opinion Denying Rehearing May 16, 2005.
*1123 Andrew B. Sacks, John K. Weston, Sacks, Weston, Smolinsky, Albert & Luber, Philadelphia, PA, and Stuart H. Smith, Michael G. Stag, Smith & Stag, and Stephen B. Murray, Arthur M. Murray, Murray Law Firm, and Ron A. Austin, Spears & Spears, and William A. Porteous, III, Porteous, Hainkel & Johnson, L.L.P., and Jack W. Harang, Harang & Barker, LLC, New Orleans, LA, for Plaintiffs, Joseph Grefer, et al.
Sam A. LeBlanc, III, Ron A. Sholes, Glen M. PiliÉ, Louis C. Lacour, Jr., Martin A. Stern, Robert N. Markle, Adams and Reese LLP, and Mitchell J. Landrieu, New Orleans, LA, for Defendant, Exxon Mobil Corporation.
Thomas E. Balhoff, Judith R. Atkinson, Roedel Parsons Koch Blache Balhoff & McCollister, Baton Rouge, LA, for Defendant, Intracoastal Tubular Services, Inc.
Herman Robinson, General Counsel, Perry M. Theriot, April Snellgrove, Louisiana Department of Environmental Quality, Legal Affairs Division, Baton Rouge, LA, Amicus Curiae, Dr. Hall Bohlinger, Secretary of the Department of Environmental Quality and Murphy J. Foster, Jr., Governor, State of Louisiana.
(Court composed of Judge MICHAEL E. KIRBY, Judge MAX N. TOBIAS, JR., Judge LEON A. CANNIZZARO, JR.).
LEON A. CANNIZZARO, JR., Judge.
The defendants, Exxon Mobil Corporation ("Exxon") and Intracoastal Tubular Services, Inc. ("ITCO"), and the plaintiffs, Joseph Grefer, Camille Grefer, Rose Marie Grefer Haase[1], and Henry Grefer ("the Grefers"), appeal from a district court judgment rendered in accord with a jury verdict, awarding the Grefers compensatory and punitive damages as a result of the defendants' contaminating their immovable property[2] with radioactive material. Exxon *1124 on also appeals from the district court judgment denying its exception of prescription.

BACKGROUND HISTORY
The operations of most major oil companies are integrated to include exploration and production, refining, and marketing of oil and gas. In the production phase, a well is drilled down to oil bearing sand, casing is cemented in the hole, tubing is run down the hole, and the tubing and casing are perforated at the level of the oil bearing sand to help bring the oil and natural gas to the surface. A section of the tubing is 2 to 3 inches in diameter and 30 feet long. The tubing is screwed together, and depending on the depth of the hole, could involve a string of tubing thousands of feet deep. Pressure underground forces oil and gas through the perforated casing and tubing up to the wellhead at the surface. At that point, separator tanks are used to separate the oil and gas, the oil is piped to a refinery for further processing into gasoline, diesel fuel, jet fuel, etc., and the natural gas is sent to a gas processing plant to separate the various components.
As time goes by, water from underground also mixes with and comes to the surface with the oil and gas. The water usually only appears in mature fields since it is heavier than oil and is generally not "produced" until much of the oil reservoir has become depleted. This water is referred to as "produced water" since it is "produced" up through the well. "Produced water" historically has been pumped back into the ground, or discarded in estuaries.
In the early 1900s, the oil industry discovered that the underground water leached certain mineral salts out of the earth's crust and the "produced water" then carried those mineral salts in solution up the tubing toward the surface. As the water came through the perforations and rose up the tubing, the change in pressure and temperature caused those mineral salts to precipitate out of solution and form a scale or crust on the inside of the tubing, and also in the separator tanks at the surface near the wellhead. As scale built up inside the tubing, the production rate of oil and gas slowed down as the flow path became increasingly constricted. When this occurred the oil company extracted the tubing from the well and sent it to a pipe yard where a cleaning contractor mechanically reamed the inside of the tubing to return it to its original diameter.
As early as 1914, the oil companies were aware that the chemical composition of the scale was primarily "barium sulfate." In the 1940s, chemical dictionaries identified "radium sulfate" as commonly being a co-precipitate with "barium sulfate." Several years later, in 1953, in a geological study done for the United States Atomic Energy Commission, radium sulfate was identified as the radioactive scale precipitate in oil field equipment used in southeastern Kansas oil fields. It was then that the oil industry learned that radium sulfate in small percentages was being co-precipitated with the scale's chief components, non-radioactive barium sulfate, strontium sulfate, calcium sulfate, and calcium carbonate.
In July 1971, representatives from Phillips Petroleum Company notified Exxon that it had found low-level radioactive deposits inside production equipment in its gas plants. Thereafter, Exxon undertook an investigation of its own gas plants. During the course of its investigation, Exxon found low-level radioactive deposits in varying amounts inside pumps and compressors in most of the gas plants. Exxon concluded that the source of the radioactivity was a radioactive gas entering the gas plants with the natural gas stream coming *1125 from the wellhead. Several years later, in 1977, the oil companies, including Exxon, learned that other radioactive materials had been identified in equipment in a Shell Oil refinery in the United Kingdom ("U.K.").
In 1981, in a routine well logging operation on two Occidental Petroleum Corporation platforms in the North Sea, drillers registered elevated levels of radioactivity from the radioactive scale in equipment on the platforms and the tubing in the well holes. The levels of radiation required Occidental to report the discovery to U.K. governmental authorities. The National Radiological Protection Board ("NRPB"), under contract to the U.K. government, did further testing and identified the radioactive component as radium-226, in the form of radium sulfate, co-precipitated with barium sulfate, calcium sulfate, and strontium sulfate. Radium-226 has a half-life[3] of approximately 1,600 years.
All major oil companies operating in the North Sea, including Exxon, were immediately made aware of Occidental's discovery through the United Kingdom Offshore Operators Association ("UKOOA"), the oil industry trade association. As a result of the discovery, the U.K. Government held a major conference in 1983 for the oil companies dedicated solely to the NORM[4] problem. In 1985, the UKOOA Safety Committee published NORM safety guidelines and a NORM Reference Manual, which were distributed to all oil companies.[5]
On April 10, 1986, Chevron identified radium-226 in oilfield equipment at a well site near Brookhaven, Mississippi. As a result of Chevron's discovery, Exxon conducted surveys at four Exxon Mississippi well sites in June 1986 and found radium-226 at those sites. Later that month, Exxon representatives met with other oil company representatives at the Alabama/Mississippi Mid-Continent Oil & Gas Association meeting to discuss the radioactive scale problem. Following the meeting, Exxon industrial hygienist, Mr. Lindsay Booher, reported to Mr. M.F. Terrell, a production manager for Exxon's Eastern Division, which covered Louisiana, Mississippi, Alabama, and Florida, advising him what he had found. In a letter dated June 19, 1986, Mr. Booher informed Mr. Terrell that where oilfield equipment was opened up for maintenance, inspection, and cleaning, there would be a human health concern, and if equipment contaminated with radioactive scale was turned over to contractors for cleaning, those contractors had to be notified of the presence of radioactivity. ITCO was Exxon's main cleaning contractor. Over the next several months, Exxon prepared a videotape and a letter advising cleaning contractors of the NORM problem and how to manage it.
On March 27, 1987, Exxon representatives met with Mr. John Hooper, president of ITCO, and other ITCO employees, to inform them of the NORM problem. At that time, Exxon played the video and gave them a set of procedural safety guidelines prepared by Mid-Continent Oil *1126 & Gas Association to follow when handling NORM contaminated equipment. The focus of the Exxon video and safety procedures was on precautions to prevent workers from breathing or ingesting airborne dust. At that time, Exxon's representatives made no mention of the possible buildup of radioactive scale on ITCO's premises even though it knew the pipe scale had been accumulating on the premises for years and had learned in June 1986 that it was hazardous.
Following the meeting, Mr. Hooper decided that ITCO would not clean any more piping/tubulars that contained NORM, and he informed Exxon of his decision. According to its guidelines, Exxon determined that piping/tubulars with NORM levels reading 5pCi/g (five picoCuries per gram) "above background"[6] were deemed contaminated.[7] Mr. Hooper then had the Exxon piping/tubulars monitored as they entered the ITCO yard to verify that they were below the 5pCi/g threshold. Piping/tubulars that were above the threshold were segregated to an area in ITCO's lower yard that was leased to Exxon. This area was fenced off and posted. Mr. Hooper also surveyed the piping/tubulars in the pipe racks on the premises to determine if they registered any elevated NORM levels. The piping/tubulars in the racks that had elevated levels of radioactivity were moved to the segregated area. The survey of the ITCO yard, which included the Grefer tract, did not register above background levels with the exception of the two following areas: 1) the ground near an inspection shed outside of the Grefer property, and 2) the ground where the pipe cleaning machine was situated on the Grefer property.
Shortly thereafter, ITCO built a Controlled Environmental Cleaning ("CEC") unit to clean NORM contaminated pipe. The unit had a special dust collection vacuum system, and ITCO demonstrated it for Exxon hygienists and engineers in the summer of 1987. Exxon requested several minor modifications, which ITCO made. However, no one from Exxon ever informed Mr. Hooper that the unit had been approved. Thus, ITCO never used it commercially. Sometime thereafter, ITCO's business began to steadily decline, and Mr. Hooper decided to shut down operations.

FACTS AND PROCEDURAL HISTORY OF THE CASE
ITCO was founded in 1935 as an oil and gas service company. The business was located on Peters Road adjacent to the Harvey Canal in Harvey, Louisiana. Initially, ITCO stored and warehoused oil field production pipe for Humble Oil & Refining Company (a predecessor to Exxon). Eventually, ITCO expanded its services to include the cleaning, inspecting, testing, threading and transporting of pipe for Exxon and other oil companies. To accommodate its expanding operation, in *1127 1968, ITCO began leasing several parcels of adjacent land from Mrs. Camille Antoine Grefer ("Mrs. Grefer"). Between 1968 and 1992, ITCO had leased eight separate tracts of the Grefer property.[8] Beginning in 1984, however, ITCO chose not to renew five of the leases because it had purchased an adjacent 240-acre tract of land for its pipe yard activities.
Due to the decline in business, in June 1992, Mr. Hooper met with Judge Joseph Grefer to discuss terminating ITCO's three remaining leases, G-2, G-3 and G-6. Mr. Hooper informed Judge Grefer that he wanted to cease ITCO's business operations at the end of August 1992. He told Judge Grefer that he would pay the monthly rentals through that date, and asked Judge Grefer if his mother, Mrs. Grefer, would forego the additional three years of rental payments due under the leases. Judge Grefer agreed to recommend this to his mother.
After discussing the matter with her son, Mrs. Grefer agreed to terminate ITCO's remaining leases in exchange for $23,193.51. Mr. Hooper then contacted ITCO's attorney, Daniel Lund[9], who prepared a "Release, Settlement and Termination Agreement" for the parties to sign. After reviewing the proposed release agreement and finding it insufficient, Judge Grefer spoke to Mr. Lund sometime between June 30 and July 2, 1992, and asked him at that time to insert a clause in the release agreement to reserve the lessor's rights and claims against third parties. Edmond Haase, III, Mrs. Grefer's grandson and a colleague of Mr. Lund, brought the revised release agreement to Judge Grefer and suggested that he call Mr. Hooper about possible radiation on the property. Shortly thereafter, Judge Grefer called Michael Hooper, Mr. Hooper's son, who assured him that an inspection of the property disclosed no radioactive contamination. Based on Michael Hooper's assurances, Judge Grefer approved the revised release agreement and Mrs. Grefer signed it on July 13, 1992. Judge Grefer then returned the signed agreement to Mr. Lund, who forwarded it to Mr. Hooper for his signature. The fully executed agreement was then recorded in the Conveyance Records of Jefferson Parish.
Several years later, in September 1996, an attorney representing a former ITCO employee contacted Judge Grefer, seeking permission to enter the property formerly leased to ITCO to test for radioactive contamination. Judge Grefer allowed the property to be tested and the following month he received the sampling report and laboratory analysis confirming that the property was contaminated with radium.
In August 1997, the Grefers filed suit against Exxon, ITCO, and Alpha Technical Services, Inc. ("Alpha Technical")[10], among others, alleging that they had recently discovered their property was contaminated with Technologically Enhanced Radioactive Material ("TERM")[11] from *1128 scale deposited on used oilfield piping/tubulars that were cleaned and/or maintained by ITCO and Alpha for Exxon and other oil companies. They claimed that the defendants knew that the TERM contained hazardous, toxic and carcinogenic substances and was present in both inshore and offshore oil producing wells but never informed the public of the safety hazard. As to Exxon and the other defendants, the plaintiffs asserted causes of action in negligence, strict liability, absolute liability, nuisance, and fraud and sought compensatory damages for loss of use and remediation of the property as well as punitive damages pursuant to La. C.C. art. 2315.3. The plaintiffs also asserted a breach of contract claim against ITCO.
ITCO subsequently filed a cross-claim against Exxon, alleging that pursuant to its contracts with Exxon, Exxon was required to provide ITCO with any pertinent information on any known toxic and hazardous substances contained in its oilfield piping/tubulars. Exxon was also required to meet with ITCO on a regular basis to determine whether any changed condition or specific health or safety hazards would be encountered by ITCO during its pipe cleaning operations. ITCO also alleged that these contracts provided a "Distribution or Risks" between the parties wherein Exxon contractually assumed the risk for its own negligence, willful misconduct, and/or strict liability. ITCO claimed that Exxon sent the majority of its used tubulars from its Eastern and Offshore Divisions to ITCO to clean, and that Exxon had knowledge of radioactive scale deposits in some of the piping/tubulars prior to March 27, 1987, the date Exxon first disclosed to ITCO the existence of NORM in the tubulars. ITCO alleged a claim against Exxon for the NORM deposited during ITCO's pipe/tubular operations at ITCO's owned or operated sites based upon Exxon's breach of the health and safety disclosure provisions of the ITCO/Exxon contracts. ITCO further alleged that in the event it would be cast in judgment in favor of the Grefers on the main demand, it would be entitled to full indemnity and/or contribution from Exxon.
Prior to trial, the plaintiffs dismissed all defendants other than ITCO and Exxon. After a five-week trial, the jury returned a verdict in favor of the Grefers and awarded them compensatory damages in the amount of $56,145,000.00, which included $145,000.00 in general damages and $56,000,000.00 in restoration costs (special damages), as well as exemplary (punitive) damages in the amount of $1,000,000,000.00 (one billion dollars). In answers to the jury interrogatories, the jury allocated 85% of the fault to Exxon, 5% to ITCO, 5% to Alpha Technical and 5% to OFS, Inc.[12] The jury also answered special interrogatory number 11 in favor of ITCO, holding that "ITCO is entitled to recover from Exxon all amounts awarded against ITCO under its counterclaim against Exxon[.]" A month after the jury returned its verdict, the trial court held a separate hearing to consider the merits of Exxon's exception of prescription. Following the hearing, the trial court rendered a judgment denying the exception and a judgment in accord with the jury's verdict. *1129 It is from these judgments that Exxon, ITCO and the Grefers appeal.

ASSIGNMENTS OF ERROR
Exxon raises the following seven assignments of error on appeal:
1. The trial court erred in denying Exxon's exception of prescription;
2. The trial court judgment is based on an unlawful jury verdict;
3. The trial court erred in refusing to instruct the jury on the Louisiana Department of Environmental Quality ("DEQ") standards governing NORM limits for unrestricted-use land;
4. The trial court erroneously instructed the jury on exemplary damages though the plaintiffs' cause of action accrued before the legislature enacted Louisiana Civil Code article 2315.3;
5. The jury's award of exemplary damages was manifestly erroneous because the evidence does not support a finding that Exxon engaged in wanton or reckless conduct;
6. The jury's punitive damages award is unconstitutional, excessive, and must be vacated or reduced to comport with due process; and
7. The trial court erroneously instructed the jury on ITCO's indemnity claim.
ITCO's single assignment of error is that the jury erred in finding it at fault. The Grefers sole assignment of error is that the trial court erred in refusing to attach prejudgment interest to the jury's punitive damage award.

DISCUSSION

Prescription
Exxon argues on appeal that the plaintiffs' claims had prescribed four years before they filed suit in 1997. Specifically, it argues that Judge Grefer admitted that he had acquired knowledge from his nephew, Mr. Haase, that there might be a problem with radiation on the property during ITCO's negotiations to terminate the three remaining leases and transfer the property back to Mrs. Grefer in 1992. This knowledge, Exxon contends, was sufficient to excite attention, prompt further inquiry, and commence the running of the one-year prescriptive period at that time.
The plaintiffs, on the other hand, contend that Judge Grefer made a reasonable inquiry in 1992 when, at the suggestion of his nephew, he asked Mr. Michael Hopper about the possibility of radiation on the property. Invoking the doctrine of contra non valentem, they argue that prescription could not have commenced at that time because Exxon had withheld from ITCO the results of subsurface surveys conducted at the ITCO yard prior to 1992 that disclosed radioactive contamination on the property. Also, the plaintiffs argue that because the radioactive material was hidden randomly, subsurface, they had no way of knowing their property was contaminated until they obtained actual knowledge of the contamination when Judge Grefer received the results of the radiation study conducted in October 1996.
When damage is caused to immovable property, the one-year prescriptive period commences to run from the day the owner of the immovable acquired, or should have acquired, knowledge of the damage. La. C.C. art. 3493.
When an exception of prescription is filed, the burden of proof is on the party pleading prescription. Lima v. Schmidt, 595 So.2d 624, 628 (La.1992). If, however, prescription is evident on the face of the pleadings, then the burden shifts to the plaintiff to show that the cause of action has not prescribed. Eastin v. Entergy Corporation, XXXX-XXXX, p. 5 (La.2/6/04), 865 So.2d 49, 54.
*1130 The rule of prescription is subject to the discovery rule of contra non valentem agere nulla currit praescriptio, which suspends the running of prescription during the period in which the cause of action was not known by or reasonably knowable by the plaintiff. Plaquemines Parish Commission Council v. Delta Development Company, Inc., 502 So.2d 1034 (La.1987). The Louisiana Supreme Court set forth four instances where contra non valentem is applied to prevent the running of prescription: (1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting upon the plaintiff's action; (2) where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting; (3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; and (4) where the cause of action is not known or reasonably knowable by the plaintiff, even though this ignorance is not induced by the defendant. Id. at 1054-55. The Court, in Jordan v. Employee Transfer Corp., 509 So.2d 420 (La.1987), clarified its application of contra non valentem, stating:
Prescription will not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong. Prescription should not be used to force a person who believes he may have been damaged in some way to rush to file suit against all parties who might have caused that damage. On the other hand, a plaintiff will be responsible to seek out those whom he believes may be responsible for a specific injury.
When prescription begins to run depends on the reasonableness of a plaintiff's action or inaction.
Id., 509 So.2d at 423. Constructive knowledge or notice sufficient to commence the running of prescription, however, requires more than a mere apprehension that something might be wrong. Landry v. Blaise, Inc., XXXX-XXXX, pp. 5-6 (La.App. 4 Cir. 10/23/02), 829 So.2d 661, 665-66. Prescription will commence only when the plaintiff knew or should have known by exercising reasonable diligence that tortious conduct occurred and that certain parties are responsible. Id. at 666.
At the post-trial prescription hearing, in addition to Judge Grefer's testimony, Exxon introduced into evidence the deposition testimony of Mr. Lund taken on January 9, 2001, and proffered the testimony of Mr. Haase as well as several documents evidencing Mr. Haase's legal representation of ITCO.[13] Exxon also asked the court to consider an affidavit executed by Mr. Lund.[14]
*1131 Judge Grefer testified at the prescription hearing that Mr. Hooper came to him in June 1992 to discuss terminating the leases because he was closing his business. He further testified that his nephew, Mr. Haase, who was representing ITCO at the time, brought him the final document prepared by the Montgomery Barnett law firm to formally terminate the leases and suggested that he contact Michael Hooper to discuss whether there was a problem with radiation on the property. Judge Grefer then called Mr. Michael Hooper, who assured him that he, personally, had inspected the property and found no radiation. According to Judge Grefer, he accepted Mr. Michael Hooper's representation and, based on their families' close business and personal relationship, had no reason to doubt his word. Judge Grefer also acknowledged that he had spoken to Mr. Lund after reviewing an initial draft of the lease termination agreement because he was concerned about reserving his mother's rights against any third parties who might be responsible for damage to the property. However, he testified that he did not recall ever discussing with Mr. Lund his concern about radiation or other environmental damage to the Grefer property.[15] Also, Judge Grefer denied ever visiting the ITCO premises in 1992 to observe the cleaning and remediation of an area around the pipe-cleaning machine.
Mr. Lund testified at his deposition that he had several phone conversations with Judge Grefer in late June and early July 1992 during which Judge Grefer asked him to include a reservation of rights provision in the release, settlement and termination agreement because he was concerned about radioactive contamination. Mr. Lund told Judge Grefer that ITCO had advised him that they had found an area on the property with a radioactivity reading above acceptable background levels in an area near the pipe cleaning machine; that the machine had been cleaned and that the area around it had been scraped with a bulldozer and the dirt was moved to another site. According to Mr. Lund, Judge Grefer then told him that he had been to the property himself and observed the work being done.[16]
*1132 After considering the evidence from the trial and the post-trial prescription hearing, the trial court determined that prescription was not evident on the face of the plaintiffs' petition and that Exxon had the burden of proof but did not satisfy its burden. In reasons for judgment, the trial court stated that she found both Judge Grefer and Mr. (John) Hooper were credible witnesses.[17] She determined that when Mr. Haase informed Judge Grefer of possible contamination in 1992, Judge Grefer made a reasonable inquiry of Mr. Michael Hooper and due to the long-term business and professional relationship between them, Judge Grefer was reasonable to rely upon Mr. Michael Hooper's representations that the property had been tested and there was no radioactive contamination. The trial court doubted that Judge Grefer, an attorney and former judge, would have allowed ITCO to terminate the lease three years early and as compensation receive only the rent due through August 1992 and a reservation of rights as to third parties if he had any knowledge of contamination in 1992. She also questioned the veracity of Mr. Lund's testimony that he told Judge Grefer in 1992 that ITCO knew that an area of the property was contaminated. The court opined that Mr. Lund's statement was against his client's (ITCO's) interest and "defied belief."[18]
When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings, for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). If the trial *1133 court's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Id.
After reviewing the record, we find the trial court was correct in determining that prescription was not evident on the face of the plaintiffs' petition and that Exxon had the burden of proof but did not satisfy its burden by a preponderance of the evidence. Furthermore, we cannot say the trial court was clearly wrong in determining that Judge Grefer acted reasonably in relying on Mr. Michael Hooper's assurances that the Grefer property did not contain unacceptable levels of radioactive waste. The trial court made findings of fact based on her determination that both Judge Grefer and Mr. Hooper were credible witnesses, and her findings, are supported by evidence in the record. Thus, we cannot disturb the trial court's judgment overruling the defendants' exception of prescription.

Unlawful Jury Verdict
In its second assignment of error, Exxon argues that the judgment is based on an unlawful jury verdict, and the trial court reformed the verdict without legal justification. Specifically, Exxon contends that the transcript from the original jury polling disclosed that on interrogatory number 2 (whether Exxon's fault caused damage to the plaintiffs' property) only seven jurors answered, "yes." After reviewing his audiotapes, the court reporter, Mr. Joseph Catalano, amended the transcript to reflect that eight jurors voted "yes" and four voted "no." Mr. Catalano then certified the transcript as being "true and correct." Exxon subsequently obtained a copy of the certified transcript and discovered the vote tally on interrogatory number 2 was deficient, as only eight "yes" votes were recorded. Exxon notified the court of the deficiency. Meanwhile, the plaintiffs had filed a motion to correct the record pursuant to La. C.C.P. art. 2132 to reflect that juror number three, Mr. Emile Ferbos[19], voted affirmatively to interrogatory number 2. Nearly a year after the jury rendered the verdict, the trial court granted the plaintiffs' motion and amended the official transcript to reflect that nine jurors had voted affirmatively on interrogatory number 2.
The plaintiffs argue that Exxon cannot contest the trial court's correction of the erroneous jury poll transcript because Exxon failed to make a contemporaneous objection to the vote count on interrogatory number 2 at the time the jury was polled. Also, the plaintiffs point out that the trial court corrected the transcript based upon her recollection of the jury poll and the notes taken by Exxon's counsel at that time, which were consistent with the evidence proffered at the hearing on the motion to correct the record.
Louisiana Code of Civil Procedure article 1797(B) provides, "[i]f trial is by a jury of twelve, nine of the jurors must concur to render a verdict unless the parties stipulate otherwise." Article 2132 of the Code of Civil Procedure provides that a record on appeal which is incorrect or contains misstatements, irregularities or informalities may be corrected by the parties by stipulation, by the trial court or by the order of the appellate court. Furthermore, Code of Civil Procedure article 2088 confers upon the trial court jurisdiction to "correct any misstatement, irregularity, informality, or omission of the trial record, as provided in Article 2132."
After the jury's verdict was read in open court, Exxon's counsel requested that the *1134 trial court poll the individual jurors as to each interrogatory. The original transcript of the jury poll reflects that initially seven jurors voted "yes" and five jurors, including Mr. Ferbos and Ms. Huyen Bui (juror number 8)[20] voted "no" on jury interrogatory number 2. At completion of the polling, Exxon's counsel informed the court that he had a problem with the vote on jury interrogatory number 9 regarding the cost to restore the plaintiffs' property; only eight jurors had voted "yes." The trial court met with counsel outside the presence of the jury and apparently determined the problem pertained to Ms. Bui's vote. When the trial court returned to the bench, she repeated interrogatory number 9 to Ms. Bui, who responded "yes," giving the plaintiffs' the requisite nine votes on that interrogatory. Exxon's counsel then raised an objection to the inconsistencies in the jurors' responses to interrogatory numbers 12 and 13 even though the plaintiffs had at least nine votes in their favor on each.[21] No objection, however, was ever made to the vote on interrogatory number 2.
Several months later, after Exxon discovered the deficiency in the certified transcript of the jury poll, the trial court addressed the issue at a hearing on December 21, 2001, stating for the record:
The court conducted the poll of each individual on each individual case and the numbers, and as the court will recall especially on question number two that it was only juror number two who answered it in the negative as I recall who answered it in the negative on every question.
And when the polling was being done that counsel for the plaintiff specifically stopped the court on a particular question where the number was not correct and the court took corrective action at that time and that should be reflected in the transcript as well.[[22]]
The court then allowed the attorneys to question Mr. Catalano about the certified trial transcript. Responding to questions from plaintiffs' counsel, Mr. Catalano stated that he had recently reviewed the audiotape and his contemporaneous stenographic notes of the jury poll and concluded that, while the audiotape was not very clear, his notes reflected that a change should be made in Ms. Bui's response to interrogatory number 2 from "no" to "yes," and that the certified transcript was otherwise correct. He also explained that Mr. Ferbos' vote on interrogatory number 2 was inaudible. The trial court then instructed Mr. Catalano to surrender the original audiotapes to the court for safekeeping and informed the attorneys that they would be allowed to listen to the audiotapes at a later date *1135 and that she would entertain motions to technically enhance the tapes if necessary prior to ruling on the issue.
Two months later, the plaintiffs filed a motion to correct the trial record pursuant to La. C.C.P. art. 2132, arguing that because neither the trial judge nor the attorneys present at trial noticed a polling deficiency on interrogatory number 2, it did not occur, and thus, the jury poll transcript should be corrected to reflect nine "yes" votes on interrogatory number 2.
At the hearing on the motion to correct held on April 19, 2002, the trial court allowed the plaintiffs to introduce into evidence the original tape recordings of the trial and the notes made by Exxon's counsel during the jury poll. The plaintiffs then proffered as evidence testimony by Mr. Catalano, a copy of an amended transcript prepared by him, the testimony and affidavit of Mr. Ferbos, and the testimony of both Mr. Scott Newman, an audio production specialist with Evidence Management, and Mr. Jeffrey Talbot, an audio engineer. Exxon proffered testimony by Mr. Leo "Jim" Odom, an electrical engineer specializing in audio production.[23]
In granting the plaintiffs' motion, the trial court relied on her own polling of the jurors and the parties' failure to object to the responses to interrogatory number 2 and found that the official trial transcript, which recorded Mr. Ferbos' answer to interrogatory number 2 as "no," was incorrect. The trial court then rendered judgment, ordering Mr. Catalano to amend the certified transcript of the jury poll to correct the votes cast by Ms. Bui and Mr. Ferbos in response to interrogatory 2 from "no" to "yes" and to file the corrected transcript into the record of the court.
We find the trial court did not err in correcting the record pursuant to La. C.C.P. art. 2132. The notes taken by Exxon's counsel during the jury poll reflect that Ms. Bui voted "no" to interrogatory numbers 3 and 4 only, corroborating Mr. Catalano's testimony from the December 21, 2001 hearing that she had voted affirmatively on interrogatory number 2. As to Mr. Ferbos' responses, Exxon's counsel made no clear notation to indicate his vote on any interrogatory. The fact that counsel failed to indicate a "no" vote for Mr. Ferbos supports the plaintiffs' argument that he did in fact respond "yes" to interrogatory number 2, because the notes record the "no" votes of those jurors who voted "no" on the various interrogatories.

Restoration Damages
In its third assignment of error, Exxon argues that the trial court failed to properly instruct the jury on DEQ standards governing NORM remediation of land for unrestricted use.[24] Specifically, it contends *1136 that the trial court should have charged the jury that under DEQ standards land with NORM levels of 5 pCi/g or less above background required no remedial action, i.e., no "restoration." Although the proposed charge referenced exemplary damages, Exxon contends the trial court's failure to give it gave the jury unfettered discretion in awarding restoration damages, and as a result, the jury disregarded evidence that only minimal effort and cost was needed to render the plaintiffs' property completely fit for unrestricted use. Alternatively, Exxon complains that the jury charge included no requirement of "reasonableness." Thus, Exxon contends the $56 million restoration award is unreasonable and manifestly erroneous in view of the evidence that the Grefer property is valued at only $1.5 million. Based on these errors, Exxon requests a de novo review.
The plaintiffs counter that Exxon objected to the trial court's refusal to give its proposed jury charge regarding DEQ standards on the basis of exemplary rather than restoration damages, and, therefore, waived its right to appeal the restoration award on the basis of an insufficient jury instruction.
The record reflects that the trial court held a conference on May 10, 2001, at which the parties apparently debated proposed jury charges, but the court reporter verified that the transcript from the conference is missing. The transcript from a conference held on May 18, 2001, the day the jury was charged, nonetheless reflects that Exxon's counsel had asked for a charge limiting restoration damages and objected when it was denied. Thus, Exxon preserved its right to raise the issue on appeal.
La. C.C.P. art. 1792(B) requires the trial court to instruct the jurors on the law applicable to the cause submitted to them. The sufficiency of a jury charge must be determined in light of the charge as a whole. The court is not required to give the precise instruction submitted by either party, but must give instructions that properly reflect the applicable law in light of the facts of the particular case. Even if the requested instructions are fair statements of the law, the trial court need not include them verbatim but may strike a fair balance so that no one issue is unduly emphasized. Baxter v. Sonat Offshore Drilling Inc., 98-1054, p. 6 (La.App. 1 Cir. 5/14/99), 734 So.2d 901, 906. Whether to include a requested jury instruction is a matter within the wide discretion of the trial court, and its decision will not be overturned absent an abuse of that discretion. Wingfield v. State, Dept. of Transportation and Development, 2001-2668, p. 17 (La.App. 1 Cir. 11/8/02), 835 So.2d 785, 801. The discovery of an error in the instructions does not by itself justify a de novo review. The appellate court must measure the gravity of the error, while considering the instructions as a whole and the circumstances of the case. Id. A verdict should not be set aside unless the error in the instructions misled the jury to such an extent so as to prevent it from doing justice. Id.; Baxter, 98-1054 at p. 6, 734 So.2d at 906.
Both parties, to some extent, rely on the Louisiana Supreme Court's decision in Roman Catholic Church of the Archdiocese of New Orleans v. Louisiana Gas Service Company, 618 So.2d 874 (La.1993). In that case, the U.S. Department of Housing and Urban Development ("HUD") acquired a 13-building apartment *1137 complex in 1976 in consideration of the cancellation of a $3.3 million loan. In 1977, HUD entered into an agreement with the Roman Catholic Church for the Archdiocese of New Orleans ("Church") to manage the housing complex in order to provide federally subsidized housing to low-income families; HUD spent $3 million renovating the complex from 1977 through 1980. In 1981, the Church agreed to acquire the complex for $1.7 million, subject to the resolutory condition that if the Church failed to maintain the complex as a facility for low-income families for 15 years, the complex's ownership would revert to HUD. In 1983, a fire destroyed one of the buildings in the complex; the fire was caused by a malfunction in the defendant's (Louisiana Gas Service Company's) gas regulation equipment in the building, which caused a natural gas surge. The defendant acknowledged its fault, thus making the only issue for trial the quantum of damages. The trial court ruled that the Church's recovery was limited to the amount it expended to restore the building to its pre-fire condition less depreciation. The Court ultimately concluded that the expenditure of $232,677.00 for restoration without depreciation of one building was reasonable albeit the Church had paid but $1.7 million for the property and the renovated building had a longer useful life.
The Supreme Court stated that "[t]he single issue presented is whether the lower courts erred in limiting plaintiffs' damages to replacement cost, less depreciation, rather than awarding the plaintiffs the full cost of restoration that had been reasonably incurred." Id. at 876. The Court concluded that:
[A]s a general rule of thumb, when a person sustains property damage due to the fault of another, he is entitled to recover damages including the cost of restoration that has been or may be reasonably incurred, or, at his election, the difference between the value of the property before and after the harm. If, however, the cost of restoring the property in its original condition is disproportionate to the value of the property or economically wasteful, unless there is a reason personal to the owner for restoring the original condition or there is a reason to believe that the plaintiff will, in fact, make the repairs, damages are measured only by the difference between the value of the property before and after the harm. Consequently, if a building such as a homestead is used for a purpose personal to the owner, the damages ordinarily include an amount for repairs, even though this might be greater than the entire value of the building.
Id. at 879-80. (Emphasis supplied).
The Court also recognized that damage awards between private litigants for costs of remediation of environmental problems necessarily involve the consideration of the assessments and compliance orders of the DEQ, the primary state agency concerned with environmental protection and regulation. See, Matter of American Waste and Pollution Control, Co., 93-3163 (La.9/15/94), 642 So.2d 1258 and Save Ourselves, Inc. v. Louisiana Environmental Control Commission, 452 So.2d 1152 (La.1984). The DEQ's actions in protecting the public interest in the environment are governed by a rule of reasonableness that "requires a balancing process in which environmental costs and benefits must be given full and careful consideration along with economic, social and other factors." Save Ourselves, 452 So.2d at 1157. As the Second Circuit aptly noted in Morris & Dickson Co., Inc. v. Jones Brothers Company, Inc., 29,379 (La. App. 2 Cir. 4/11/97), 691 So.2d 882,

*1138 [t]he DEQ's exercise of its role as the public trustee for the protection of the environment results in the development and imposition of a remediation plan [that] determines in large part the measure of damages for the environmental liability affecting a particular property. Apart from this imposed liability as a broad remedy for the public's protection, the actual damages for the private litigants involved in the controversy might not be the same under the conventional measure of damages.
Id. at 17, 691 So.2d at 892.
In this case, the trial court charged the jury on restoration damages as follows:
Generally, when a plaintiff sustains damage to property due to the fault of another, he is entitled to recover damages, either the cost of restoration or the difference between the value of the property before and after the harm. However, if the cost of restoring the property to its original condition exceeds the value of the property damages may be measured by the difference between the value of the property before and after the harm. You may award plaintiffs' [sic] the cost to repair and restore the property if you find that plaintiffs intend to repair or restore it. As a general rule, a plaintiff should be put in as good a position as before his property was damaged, but not a superior position.
This jury charge clearly sets forth the law as enunciated in Roman Catholic Church, supra, but makes no reference to DEQ rules governing the remediation of land for unrestricted use.
The trial court's jury instruction on restoration damages insofar as it followed Roman Catholic Church is a correct statement of the law, and when the jury instructions are viewed as a whole, we cannot say that the exclusion of the DEQ standard from the jury charge misled the jury or tainted the verdict. Also, the record contains extensive testimony from environmental experts and documentary evidence pertaining to DEQ NORM regulations on land remediation and Exxon has not shown that the jury ignored this evidence due to the absence of the proposed jury charge in making its award.
Next, we must consider whether the jury's award of $56 million in restoration damages is unreasonable or manifestly erroneous in view of the evidence presented at trial.
The Louisiana Supreme Court in the case of Corbello v. Iowa Production, 02-0826 (La.2/25/03), 850 So.2d 686, considered the issue of whether the trial court erred in rendering judgment on a jury verdict that awarded the plaintiff $33 million for the defendant's failure to restore property to its original condition even though the land would be worth $108,000.00 in the restored condition. In 1961, the plaintiffs by a written contract leased land to the defendant for the purpose of conducting the defendant's oil and gas related activities. The lease in pertinent part stated:
Lessee agrees to indemnify and hold lessor harmless from any and all loss, damage, injury and liability of every kind and nature that may be caused by its operations or result from the exercise of the rights or privileges herein granted. Lessee further agrees that upon termination of this lease it will reasonably restore the premises as nearly as possible to their present condition. [Emphasis supplied.]
The Court noted that the contract did not limit the defendant's liability for reasonable restoration to the market value of the property. Id. at p. 7, 850 So.2d at 694. Included within the $33 million damage award was $28 million for restoration of *1139 the Chicot Aquifer even though the trial testimony established only that the aquifer might be contaminated. Id. at pp. 12-14, 850 So.2d at 697-98. Distinguishing Roman Catholic Church, supra, on the basis that it was a tort suit, the Court held that the contract was the law between the parties that did not limit the defendant's liability for damages. Id. at p. 8, 850 So.2d at 694-95. The Court further held that the contractual obligation to reasonably restore the property was not "tethered" to the market value of the property. Id. at p. 6, 850 So.2d at 693. The Court recognized the right of a party to recover the costs of remediation even though the damaged party could not be forced to use the award to do so. Id. at pp. 12-21, 850 So.2d at 697-701. Citing Federal Insurance Co. v. Insurance Co. of North America, 262 La. 509, 263 So.2d 871 (1972), the Court noted that when one has a contractual relationship with another and claims to have been damaged by the conduct arising out of that contractual relationship, two remedies exist: one in contract and another tort; the damaged party may elect to recover his damages in either tort or contract. Corbello, p. 32, 850 So.2d at 708. If the damaged party elects to proceed in contract, he waives his right to seek exemplary damages. Id. at p. 31, 850 So.2d at 707. On rehearing by per curiam, the Court specifically emphasized that a party could only recover for actual harm, not potential harm. Id. at p. 1, 850 So.2d at 715.
As to the evidence presented at trial concerning restoration costs, the plaintiffs' expert, Stanley Waligora, a health physicist certified by the American Board of Health Physics and principal health physicist with Environmental Dimensions, Inc., testified that he had extensive experience working under contract with the United States Government on the remediation of radioactive waste sites. Although he did not actually survey the Grefer property, Mr. Waligora visited the site on several occasions. He estimated that it will cost the plaintiffs between $60 million and $82 million to test, collect, contain, transport, and dispose of the radioactive waste on the surface and subsurface of the 32.75-acre property to comply with the DEQ and the United States Environmental Protection Agency ("EPA") regulations. According to his estimate, disposal costs alone would be $58,862,684.00. In reaching his conclusion, Mr. Waligora considered the public's safety and the history of the site, i.e., ITCO had cleaned piping/tubulars on the property for many years. He explained that his cleanup procedure used a "segmented gate system" that was designed by the U.S. Departments of Energy and Defense and has been used by the federal government and private industries for remediation of similar sites. The plan called for the removal of the first two feet of topsoil throughout the entire Grefer tract. He chose the average depth of two feet for excavation because radiation has been found in some instances as deep as three feet and in other instances as shallow as one foot. The excavated soil would then be processed on site by a machine that scans the soil on a conveyor belt. The clean soil would be separated from the contaminated. Uncontaminated soil would be re-deposited on the Grefer tract, and the contaminated soil would be disposed of properly. Mr. Waligora acknowledged that his remediation plan was not based solely on the DEQ standard for remediation of NORM contaminated property for unrestricted use and that his estimated cost of remediation greatly exceeded the $1.5 million value of the property in an unrestricted use state. He further explained, however, that a remediation under DEQ standards requires that property be cleaned to a level sufficient to prevent public exposures in excess of 25 millirems per year, yet a soil reading of 5 pCi/g *1140 above background may still emit dangerous levels of radiation in excess of 200 millirems per year. Mr. Waligora testified that the standard of no more than 1 pCi/g above background meets DEQ, Nuclear Regulatory Commission ("NRC") and EPA dose standards and is reasonably achievable and protective of the public health.
Exxon's expert, Mr. Mark Krohn, a certified radiation protection technologist with American Radiation Service ("ARS"), testified that he performed a gamma exposure rate screening survey of the Grefer tract in June 2000 and identified five areas of the property with gamma exposure rates equal to or greater than twice background levels. He returned in August 2000 to conduct a detailed 100% gamma exposure rate survey and sampling evolution to a depth of 12 inches on those five areas and found one area that contained a sealed radium-226 source. Once the sealed source was removed gamma exposure rates returned to normal background levels. In February and March 2001, ARS conducted two separate 100% gamma exposure rate surface scans of areas of the tract that were not surveyed earlier. At that time, ARS also did a detailed sub-surface survey and sampling evolution on the entire Grefer tract to confirm the absence or presence of subsurface NORM. Mr. Krohn testified that the ARS survey indicated five small areas measuring a total of 11,518 square feet or 0.8 percent (0.8%) of the Grefer tract contained radium-226 activity levels greater than 5 pCi/gm above background, and under DEQ NORM regulations these were the only areas on the property that required remediation. Based on the ARS survey results, he opined that 99.2 percent of the property may be put to unrestricted use. Mr. Krohn emphasized that to bring the Grefer tract into compliance with DEQ regulations entailed removing the top six inches of soil. He estimated that remediation and disposal costs to release the Grefer property to unrestricted use in accordance with DEQ regulations was approximately $46,000.00. On cross-examination, Mr. Krohn acknowledged that for remediation purposes DEQ standards require the property be cleaned to prevent public exposures in excess of 25 millirems per year of radiation yet conceded that he had not done any calculations to determine the amount of radiation emitted from a soil reading of 5pCi/g above background.
The record also reflects that in the early stages of the litigation, the plaintiffs had retained the professional services of Mr. Edwin M. Cargill, a health physicist from Radiation Protection Resources, and had listed him as an expert witness for trial. At the request of plaintiffs' counsel, Mr. Cargill surveyed the Grefer property to determine the amount, if any, and location of radioactive material on the premises. In conjunction with his survey, Mr. Cargill prepared a preliminary report dated November 13, 1999, that indicated the presence of TERM on several areas of the property and estimated that the cost to remediate and restore the property for unrestricted use at $1,387,310.00. However, Mr. Cargill noted in the preliminary report that the survey results and estimated costs could change "because of the possibility that buried waste was not detected and also due to the heavily wooded state of the property, making [the] survey difficult."
The plaintiffs neither called Mr. Cargill to testify at trial nor introduced into evidence his survey and preliminary report. Exxon, however, did admit the survey results and preliminary report into evidence during the direct examination of Mr. Krohn to demonstrate that Mr. Waligora's estimate between $60 million and $80 million was clearly unreasonable. Mr. Krohn testified that although he disagreed with *1141 Mr. Cargill's remediation estimate, he did consider his survey and report in conducting the ARS survey. In contrast, Mr. Waligora, acknowledged that he had worked closely with Mr. Cargill on several remediation projects and in other litigation and that he respected his opinion, but he thought Mr. Cargill's survey results were not accurate and his remediation estimate too low because they failed to consider the full extent of the subsurface contamination on the Grefer tract.
Unlike Corbello, the Grefers and ITCO had a contract between them that did not require the land to be restored to its original state at the end of the contract. Further, the Grefers elected to proceed per Federal Ins. Co. v. Insurance Co. of North America, supra, in tort, not contract, and to exercise their right to seek exemplary damages under the now former La. C.C. art. 2315.3. Thus, Roman Catholic Church governs that which the Grefers may recover from Exxon and ITCO.
In determining damages, the trier of fact is accorded much discretion. La. C.C. art. 2324.1. On appeal, consideration of the jury's determination of damages is limited to a review for manifest error or abuse of discretion. Wingfield, supra, 2001-2668 at p. 27, 835 So.2d at 806. In determining the amount of damages, the discretion vested in the trier of fact is "great." Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, Maritime Overseas Corp. v. Youn, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, supra at 844. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Id.
In this particular case, the jury's award of $56 million for restoration damages for a tract of land whose highest market value is $1.5 million certainly appears unreasonable. Nonetheless, the Supreme Court in Corbello affirmed an award for millions of dollars of damages for a water aquifer where no evidence was presented that the aquifer beneath the Corbello property was in fact damaged by contamination from the defendant's operations and it was questionable as to the right of Corbello to recover those alleged damages. When we compare that to the language in Roman Catholic Church that requires the award of reasonable damages in a tort case, which rarely may exceed the fair market value of the property, we cannot conclude that the $56 million award in this case is unreasonable.
The jury was presented with evidence from experts estimating the cost to remediate the Grefer property ranged from $46,000.00 to $82 million dollars, with $1,387,310.00 being the closest estimate to the market value of the property. Although Mr. Waligora's estimate of $60 million to $82 million was based not on DEQ's standard for remediation of NORM contaminated property for unrestricted use, but rather on more stringent guidelines set by the EPA and Nuclear Regulatory Commission ("NRC"), the evidence reflects DEQ's regulations were considered in his remediation plan. Still, the jury's restoration award was $4 million less than Mr. Waligora's lowest estimate.
We also emphasize Judge Grefer's testimony that he and his siblings want to restore the property, which has been in the Grefer family since 1875, to its original condition and not to the mere minimum DEQ standard. He explained that they are unable to sell or lease the contaminated *1142 property without exposing themselves to liability and they do not want to burden their children with this. Judge Grefer also expressed grave concern about the effects the radioactive contamination might have on the neighbors and the general public. Clearly, the plaintiffs had both personal and economic reasons for wanting to restore their property to its original condition. Pursuant to the rule set forth in Roman Catholic Church, supra, they may elect to do so. After a review of the record, we cannot say the jurors abused their discretion or manifestly erred in making the $56 million award. Thus, we will not disturb the jury award on restoration damages.

Applicability of Louisiana Civil Code Article 2315.3
In this assignment of error, Exxon asserts that the jury's award of exemplary damages must be vacated because the plaintiffs' cause of action accrued before La. C.C. art. 2315.3 was enacted. Specifically, Exxon contends that the plaintiffs' cause of action accrued when their property first sustained the "slightest" damage, i.e., sometime in the 1960s when ITCO began cleaning NORM scale from Exxon's used oilfield equipment on Grefer property. Because the plaintiffs' cause of action accrued before 1984, and article 2315.3 cannot be applied retroactively under Anderson v. Avondale Industries, Inc., 2000-2799, p. 3 (La.10/16/01), 798 So.2d 93, 97, Exxon asserts the plaintiffs are precluded from recovering exemplary damages.
Former La. Civil Code article 2315.3 was enacted in 1984 and later was repealed by La. Acts 1996, 1st Ex.Sess., No. 2, § 1, effective April 16, 1996. The former article provided, in pertinent part:
In addition to general and special damages, exemplary damages may be awarded, if it is proved that plaintiff's injuries were caused by the defendant's wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic substances.
In support of its argument that article 2315.3 is inapplicable because the plaintiffs' cause of action accrued prior to its enactment, Exxon relies on the cases of Champagne v. Celotex, 599 So.2d 1086 (La. 1992) and Bulot v. Intracoastal Tubulars Services, Inc., 98-2105, p. 1 (La.App. 4 Cir. 2/24/99), 730 So.2d 1012. In Champagne, the Supreme Court considered whether to apply pre-comparative fault law to tort claims filed by employees injured by long-term asbestos exposure. Finding that all of the employees were injured by long-term asbestos exposure before the 1979 comparative fault law was enacted, the Court held that the pre-comparative fault mechanism for allocating liability applied even though the employees alleged that some exposure occurred after the comparative fault law went into effect. Id. at 1088.
In Bulot v. Intracoastal Tubulars Services, Inc., 98-2105, pp. 4-8 (La.App. 4 Cir. 2/24/99), 730 So.2d 1012, 1015-16, a personal injury case also involving the Grefer property and ITCO's operations, several former ITCO employees and the survivors of deceased employees filed suit against Exxon and others for injuries caused by occupational exposure to TERM scale and other toxic materials. The issue before us was whether the plaintiffs could recover exemplary damages if they or the decedents worked for ITCO prior to the enactment of La. C.C. art. 2315.3 in 1984. We held that the La. C.C. art. 2315.3 did not apply to claims filed by the living employees, or to the survival claims filed by the survivors of the deceased employees, but that it did apply to the wrongful death claims of the survivors of those former *1143 employees who died while La. C.C. art. 2315.3 was in effect.
On remand from the Supreme Court in Bulot v. Intracoastal Tubulars Services, Inc., 98-2105, p. 1 (La.App. 4 Cir. 5/17/00), 761 So.2d 799, we had to reconsider our decision in view of the Supreme Court's recent holding in Walls v. American Optical Corp., 98-0455 (La.9/8/99), 740 So.2d 1262.[25] We again concluded that the application of La. C.C. art. 2315.3 to survival actions is triggered by the date of exposure, citing Cole v. Celotex Corp., 599 So.2d 1058 (La.1992). As to the wrongful death claims, based on the Court's holding in Walls, we concluded that La. C.C. art. 2315.3 was applicable because the cause of action arose after the effective date of the amendment, noting that the law in effect at the time of death is the law that applies to a wrongful death action. Thus, the plaintiffs could seek exemplary damages in their wrongful death claims even though the decedents' exposure occurred prior to the enactment of article 2315.3 in 1984. Bulot, 98-2105 at p. 2, 761 So.2d at 800-01.
Thereafter, the Supreme Court in Bulot v. Intracoastal Tubular Services, Inc., 2000-2161 (La.11/13/00), 773 So.2d 152, granted a writ intending to address whether the application of La.C.C. art. 2315.3 to conduct arising prior to its effective date would be an improper retroactive application of the article under Walls. However, in reviewing the record, the Court determined that the plaintiffs had alleged each of the decedents had some exposure to hazardous substances after the effective date of La. C.C. art. 2315.3. Because the case was before the Court on an exception of no cause of action and the plaintiffs pled a cause of action for punitive damages arising from post-1984 conduct, the Court recalled the writ, stating that, "we express no opinion as to whether plaintiffs could recover punitive damages for pre-1984 conduct." Bulot v. Intracoastal Tubular Services, Inc., 2000-2161, p. 2 (La.2/9/01), 778 So.2d 583, 584 n. 4.
Thus, for the purpose of determining when La. C.C. art. 2315.3 applies, the relevant time period is the time the injury occurs. In Quick v. Murphy Oil Co., 446 So.2d 775, 780 (La.App. 4th Cir.1984), we stated:
We do distinguish, however, the time when a cause of action arises from when prescription begins to run. A cause of action arises when injury occurs, while prescription begins to run only when the injured party becomes aware of his injury.
Unlike Champagne and Bulot, which involved latent disease injuries, the contamination to the plaintiffs' land occurred as the result of Exxon's conduct over a period of several years. Indeed, the build up of NORM scale deposits on the surface and subsurface of the Grefer property occurred gradually during years of cleaning pipe on the premises. It is well settled that when a tort involves continuing injury, the cause of action accrues at the time the tortious conduct ceases. In re Med. Rev. Panel of Moses, 2000-2643, p. 16 (La.5/25/01), 788 So.2d 1173, 1183. Since no single incident in the continuous chain of tortious activity can be identified as the cause of significant harm, *1144 courts have held it proper to regard the cumulative effect of the conduct as actionable. Id. at p. 20, 788 So.2d at 1185.
The evidence in the record indicates that radioactive scale was discharged from the used oilfield pipes from the 1960s through 1992 when ITCO terminated its lease. The discharged scale was dumped, buried, and utilized throughout the yard as road fill and surface material. In time, radioactive contamination resulting from the NORM scale deposits was found in varying degrees throughout the Grefer tract. The record also indicates that in March 1987, ITCO first learned that Exxon's used oilfield piping/tubulars contained NORM, and it no longer cleaned NORM contaminated pipes after that date. If we were to accept Exxon's argument that the plaintiffs' cause of action accrued when ITCO began cleaning Exxon's NORM contaminated oilfield pipe in the 1960s, we would effectively excuse any punitive conduct that occurred after the enactment of La. C.C. art. 2315.3, provided it was a continuation of pre-enactment misconduct. We do not believe this was the intent of the Louisiana legislature in enacting the statute. Thus, for purposes of determining the applicability of La. C.C. art. 2315.3, we find the plaintiffs' cause of action accrued in March 1987, when ITCO stopped cleaning Exxon's NORM contaminated pipe on the Grefer land. After that date, any piping/tubulars with NORM levels reading 5pCi/g or higher above background were segregated to that portion of ITCO's property leased to Exxon.

Conduct Under Louisiana Civil Code Article 2315.3
In its fifth assignment of error, Exxon argues that the jury's award of exemplary damages must be vacated because the record does not support a finding that Exxon engaged in wanton or reckless conduct. Exxon contends the La. C.C. art. 2315.3 required the plaintiffs to prove that it sent NORM-contaminated oilfield tubing to ITCO for cleaning even though it knew public safety was at risk, or that it should have known that it was "highly probable" that its conduct would harm the public. In other words, Exxon's state of mind had to be one of "conscious indifference to the consequences, amounting almost to a willingness that harm should follow." Griffin v. Tenneco Oil Co., 531 So.2d 498, 501 (La.App. 4th Cir.1988). Exxon further argues that no reasonable juror could have concluded that Exxon acted with the quasi-criminal intent article 2315.3 required. See Oubre v. Union Carbide Corp., 99-0063, p. 22 (La.App. 5th Cir.12/15/99), 747 So.2d 212, 227.
In contrast, the plaintiffs argue that they presented sufficient evidence at trial to allow a reasonable person to conclude: (1) that Exxon acquired specific knowledge of the dangers of the radioactive waste in its oil production and specific knowledge of the procedures to protect against those dangers in 1985; (2) that Exxon never adequately warned ITCO of the danger; (3) that Exxon withheld information from the Grefers; (4) that Exxon failed to take any steps to prevent further contamination until 1987; and (5) that Exxon's preventative measures were inadequate.
The statute providing for exemplary damages for wanton and reckless disregard for public safety in storage, handling or transportation of hazardous or toxic substances must be strictly construed, as it imposes a penalty. Bonnette v. Conoco, Inc., 2001-2767, p. 27 (La.1/28/03), 837 So.2d 1219, 1236-37. To obtain an award of exemplary or punitive damages under La. C.C. art. 2315.3, the plaintiff must prove: (1) that the defendant's conduct was wanton and reckless by proving that "the defendant proceeded in disregard of a high and excessive degree of danger, either known to him or apparent *1145 to a reasonable person in his position," or that the defendant engaged in "highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent;" (2) that the danger created by the defendant's wanton or reckless conduct threatened or endangered public safety; (3) that the defendant's wanton or reckless conduct occurred in the storage, handling or transportation of hazardous or toxic substances; and (4) that the plaintiff's injury was caused by the defendant's wanton or reckless conduct. Id.; Billiot v. B.P. Oil Co., 93-1118, pp. 16-17 (La.9/29/94), 645 So.2d 604, 613.
Our review of the record discloses sufficient evidence to support the jury's finding that Exxon engaged in wanton and reckless conduct. Exxon first learned of NORM contamination in oilfield drilling equipment in 1981, when Occidental Petroleum discovered it on its platforms in the North Sea. At that time, Dr. Andrew Lloyd Smith, a Scottish environmental consultant, was working for Occidental Petroleum in the U.K., and following the discovery, was a member of the United Kingdom Offshore Operators Association (UKOOA) Safety Committee that drafted and published the UKOOA safety guidelines and Reference Manual that were given to all oil companies operating in the North Sea. ITCO offered Dr. Smith as a health and safety expert witness at trial. According to Dr. Smith, the reference manual was extensive and covered both the identification of radioactive scale and the procedure to follow up on such identification. The guidelines, promulgated by the oil and gas industry and approved by the National Radiological Protection Board ("NRPB"), recommended the specific steps to minimize or eliminate the effect of NORM on public health and the environment. Dr. Smith conceded that the UKOOA reference manual was devoted exclusively to NORM scale accumulating in the North Sea and, for all the industry knew, the NORM phenomena was peculiar to oil production in that area.
Though Exxon was abreast of the problem, it took no action to survey its wells elsewhere. The depositions of Mr. John Rullman, Director of Exxon's Eastern Division Environmental and Regulatory Affairs, and that of Mr. Everett C. Hutchinson, Exxon's Assistant Director of Environmental and Regulatory Affairs, were introduced into evidence and read to the jury at trial. Mr. Rullman testified that he had obtained a copy of the UKOOA safety guidelines and found they were very onerous, restrictive, and inflexible. He also admitted that he was not sure if at that time Exxon had the same problem in the U.S. Mr. Hutchinson, too, believed the UKOOA guidelines were unreasonable for Exxon's production operations in the U.S. Mr. Booher, Exxon's industrial hygienist, admitted that if Exxon had surveyed its wells prior to the Chevron discovery in the U.S. in 1986, then it would have discovered radium in its wellheads much sooner.
In May 1986, after learning of Chevron's NORM discovery in Mississippi, Exxon surveyed its Mississippi well sites and found radiation accumulation in its equipment. Twice Exxon officials were notified that the cleaning contractors had to be informed of the radioactivity, as it posed a health and safety hazard, but they still did nothing to warn them.
The evidence further reflects that by August 1986 Exxon was clearly worried about governmental regulation and losing the produced water exemption, which allowed it to dispose of the by-product in an unregulated manner. A memo written on August 28, 1986, by Mr. Howard Collier, Exxon's director of Environmental and Regulatory Affairs, stated, "Chevron has taken a very high profile approach to handling *1146 their discovery of radiation in Mississippi and many agencies are now involved." Mr. Collier expressed an interest in "[getting] the industry and the regulatory agencies to slow down." Then he admitted,
Chevron's discovery is nothing new. After all, if there wasn't some radiation in down-hole formations, it would be difficult to run a gamma ray log. My primary concern is the current investigation and analysis not unduly influence the EPA who is in the process of deciding under RCRA [Resource Conservation Recovery Act] whether produced water should be classified as a hazardous waste and handled as such.
Mr. Booher's notes taken from comments made by Mr. Collier at an Exxon NORM meeting in Houston on January 8, 1987, indicate the cost of losing the RCRA exemption for produced water as $750 million in the first year and $150 million for each year thereafter. At that same meeting, several Exxon officials concluded that notifying the cleaning contractors would be "premature."
Exxon was also concerned about litigation arising from the NORM discovery in Mississippi. Street, Inc., a pipe yard company in Mississippi, had filed suit against Chevron and other oil companies (not Exxon), for $35 million, claiming negligence for failure to advise that pipe delivered to it was contaminated with radioactive material. Mr. Hutchinson, in an internal memo copied to Mr. Rullman, recognized the possible "need to manage the disposal of large accumulations of contaminated scale, such as could occur at a pipe yard." Mr. Rullman, in a confidential memo dated October 14, 1986, noted ITCO was a potential "look alike" to Street, Inc., and stated, "If potential exists for radioactive material accumulation, perform low key radiation exposure measurements;" "Coordinate ITCO plan with Eastern Division;" and "Consider advisory letter to ITCO with Headquarters involvement." Still, Exxon did nothing to notify ITCO.
Eventually, Exxon sent the letter notifying the cleaning contractors of the NORM problem in March 1987, ten months after it had identified the problem at its domestic well sites. Even then Exxon downplayed the hazard, as evidenced by Exxon's meeting with ITCO. According to Mr. John Hooper, Exxon's videotape made the health risks associated with NORM scale sound minor and the safety procedure guidelines merely suggested taking precautions to avoid breathing or ingesting airborne dust.
Exxon maintains that no reasonable juror could have concluded that it knew about the NORM buildup in domestic oil production tubing before 1986. We disagree. Although the 1981 discovery of NORM inside drilling equipment was limited to the North Sea area, by that time Exxon knew that Shell Oil had found radioactive material in equipment at a refinery in the U.K. The knowledge that radioactive material had been found in both drilling and refining equipment in that region of the world coupled with the fact that just a few years earlier Exxon discovered radioactive deposits inside equipment at several Texas gas plants, and concluded the source was radon-222 entering the plants with the natural gas stream coming from the wellhead, the jury could have concluded that Exxon knew or should have known of the likelihood of NORM contamination in domestic oilfield production equipment before Chevron's Mississippi discovery in 1986. Considering the integrated nature of Exxon's operations, such a conclusion is reasonable. Also, in view of Mr. Collier's August 28, 1986 memo, stating, "Chevron's discovery is nothing new," the jury reasonably could have concluded that Exxon knew about the NORM deposits in its domestic oilfield equipment *1147 before 1986, and its failure to act sooner was wanton and reckless.
Exxon contends, too, that it acted to protect the public safety after Chevron's 1986 NORM discovery. Exxon emphasizes that after the discovery it conducted a nationwide NORM survey of all its facilities; it began screening used tubing for NORM at production sites and the contaminated tubing was storednot cleaned; it began to screen tubing at central storage facilities like ITCO; it recommended safety procedures; and it began to develop a new cleaning process that would allow for the previously-stockpiled, NORM contaminated tubulars to be cleaned safely.
We find no merit to Exxon's argument. Clearly, the evidence reflects that the action taken by Exxon after the Chevron discovery was to benefit Exxon, not the general public. As a result of the discovery, Exxon was faced with unprecedented environmental, legal, economic, and financial challenges. It had no choice but to act. In any event, we find Exxon's most egregious act was failing to notify ITCO of the NORM hazard immediately after it tested the Exxon Mississippi wells and discovered NORM at the well sites. Although Exxon's representatives claimed that to notify the cleaning contractors immediately would have been "premature" until they knew the extent of the problem and they did not want to "alarm" the public, their failure to do so is inexcusable. Exxon executives had been warned that NORM posed a human safety hazard to anyone exposed to it, but they waited nine months to send the warning letter to the contractors and to meet with ITCO. Exxon's delay in notifying ITCO of the danger was wanton and reckless. After all, the ITCO employees were the persons handling the NORM contaminated piping/tubulars on a daily basis and were most at risk, not Exxon's executives.
Upholding the jury's finding that punitive damages are warranted in this case, we turn now to consider whether the jury's one billion dollar award is constitutional.

Constitutionality of Punitive Damage Award
In this assignment of error, Exxon asserts that the $1 billion punitive damage award is unconstitutional as it violates Exxon's Fourteenth Amendment right to due process of law.
In recent years, the U.S. Supreme Court has considered several cases raising exemplary damage issues. In BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the Court ruled that exemplary damage awards that are "grossly excessive" violate the Due Process Clause of the Fourteenth Amendment. The Court then provided three "guideposts" for gauging when an exemplary damage award crosses the constitutional line: (1) the reprehensibility of the defendant's conduct; (2) the ratio between the exemplary damage award and the harm the defendant's conduct caused, or could have caused; and (3) the size of any civil or criminal penalties that could be imposed for comparable misconduct.
The constitutional constraints on the amount of exemplary awards were again considered in Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001), wherein the Court ruled that state and federal appellate courts must conduct a de novo review of exemplary damage awards challenged as being grossly excessive under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Cooper, 532 U.S. at 433-434, 121 S.Ct. at 1685-1686. In mandating a de novo review, the Court reasoned that "[u]nlike the measure of actual damages suffered, which presents a question of historical or predictive fact, the *1148 level of punitive damages is not really a `fact' `tried' by the jury." Id. at 437, 121 S.Ct. at 1686.
More recently, in State Farm Mutual Automobile Insurance Company v. Campbell, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) the Court further tightened the permissible limits of exemplary awards, holding that appellate "courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." Id., 538 U.S. at 426, 123 S.Ct. at 1524.
Keeping in mind the principles outlined in BMW of North America, Inc., v. Gore, the U.S. Supreme Court's decision in State Farm Mutual Automobile Insurance Company v. Campbell, our de novo review of the jury's exemplary damage award follows.
"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." Gore, supra, at 575, 116 S.Ct. 1589. In determining the reprehensibility of a defendant, courts are instructed to consider whether: the harm caused was physical as opposed to economic; the tortuous conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. 517 U.S. at 576-577, 116 S.Ct. 1589. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should be awarded only if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence. Id. at 575, 116 S.Ct. at 1589.
In this case, it is undisputed that the plaintiffs suffered strictly economic harm, i.e., property damage. While Exxon's conduct resulted in no physical harm to them, it certainly evinced an indifference to or reckless disregard of the health and safety of others. As stated above, Exxon's nine-month delay in notifying ITCO and the other cleaning contractors of the dangers posed from handling NORM contaminated equipment certainly put their employees at risk. Even though ITCO no longer cleaned NORM contaminated piping/tubulars after March 1987, Exxon was well aware that NORM contaminated equipment remained stockpiled on ITCO's property. This posed a health hazard to those on the premises.
We also find that the target of the conduct was financially vulnerable. ITCO had leased the property from the Grefer family for many years and during that period operated a very successful business cleaning oilfield equipment. After Exxon discovered the NORM contamination in its drilling equipment and finally realized the extent of the problem, the oil company sought to wipe its hands clean and leave ITCO with the mess. Notably, on April 19, 1989, Mr. Rullman sent a memo to Mr. Roger Koerner, Exxon's top manager for the Eastern Division, regarding "ITCO Contract Recommendations." The memo stated in part:
RAE [Exxon's Regulatory Affairs Engineering] concurs with the suggestion to screen other contractors to ascertain their abilities to decontaminate NORM material, ... The development of alternative cleaning/disposal options would help soften their stance [on contract negotiations] *1149 and may be needed anyway if the ITCO procedure does not provide sufficient cleaning. The continued use of the ITCO yard could complicate any potential personal injury liability claims since it would be difficult to determine when the exposure occurred that caused the injury. Resuming cleaning with a new contractor would clearly establish the earliest date of potential exposure, and Exxon could better contractually minimize its exposure with the new contractor. This would not, however, help Exxon with any claims from past activities at ITCO.
Shortly thereafter, ITCO's business steadily declined while Exxon sent its used oilfield equipment to new cleaning contractors. After ITCO ceased operations, terminated its lease and vacated the premises, Exxon's NORM scale remained on the premises. In addition to ITCO's failure, the Grefers are now financially burdened with the task of remediating the property.
Furthermore, we find Exxon's repeated conduct from 1985 through 1992, when ITCO finally shut down, did involve an element of deceit. Again, as mentioned above, from June 1986 to March 1987 Exxon officials intentionally withheld information regarding NORM contamination in the piping/tubulars even though they knew the scale posed a direct danger to the physical health and safety of those workers who continued to handle the NORM contaminated equipment on a daily basis. Also, after learning of the danger posed by the NORM contaminated scale, Exxon took no step to remove the radioactive material from ITCO's premises. In our opinion, Exxon's conduct was reprehensible.
Next we consider the second Gore guideline, the disparity between actual or potential harm suffered by the plaintiff and the punitive damage award. For potential harm properly to enter into the ratio, it must be directly attributable to the misconduct and not to lawful or unrelated causes. See Cooper Industries, 532 U.S. at 441, 121 S.Ct. at 1688.
In Campbell, the Utah Supreme Court justified a punitive award of $145 million in a case in which the plaintiff was awarded $1 million in compensatory damages for State Farm's bad-faith failure to settle, fraud, and intentional infliction of emotional distress. On appeal, the U.S. Supreme Court considered the award under the Gore guideposts and concluded that the award was neither reasonable nor proportionate to the wrong committed, and it was an irrational and arbitrary deprivation of the property of the defendant. Campbell, 538 U.S. at 429, 123 S.Ct. at 1526. While the Court declined to impose a bright-line ratio which punitive damages cannot exceed, it noted that its jurisprudence and the principles set forth therein demonstrate that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages will satisfy due process. The Court recognized that although "there are no rigid benchmarks," a higher ratio could be justified only if "a particularly egregious act has resulted in only a small amount of economic damages." Id., 538 U.S. at 425, 123 S.Ct. at 1524. The Court also noted that the converse is true, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." Id. The Court found the compensatory award of $1 million was "substantial," and concluded that the Gore guideposts "would [only] justify a punitive damages award at or near the amount of compensatory damages." Id., 538 U.S. at 429, 123 S.Ct. at 1526. The Court also rejected the Utah Supreme Court's reference to State Farm's enormous wealth to justify the award, stating, *1150 "[t]he wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award." Id., 538 U.S. at 427, 123 S.Ct. at 1525.
This case leaves little doubt that there is a presumption against an award that has an 18 to 1 ratio. In our opinion, the compensatory award in this case was substantial; the Grefers were awarded $56,145,000.00 for a piece of property worth at most $1,500,000.00. Although the plaintiffs claimed only property damage, and no physical harm, the trial court allowed the plaintiffs to argue and present substantial evidence, over Exxon's objections, of the potential and/or alleged actual harm to other persons who were not parties to this suit and whose claims were not before the jury. For example, in their opening statement, the plaintiffs' counsel referred to the "community" and "churches immediately next to" the Grefer property. He described radium particles in "a very, very, very fine powder" being blown "all over the place." A video was shown to the jury that depicted elementary school children getting on and off a bus. Witnesses were then asked questions designed to foment the fear of a radium dust cloud blowing over houses, churches, and schools near the Grefer property. The trial court also allowed plaintiffs' counsel to question witnesses about the potential harm of radiation to children and unborn children even though this case is strictly a claim for damage to immovable property. Likewise, the trial court allowed plaintiff, Rose Grefer Haase, a former nurse, to testify regarding the effects of x-ray radiation and the protections taken by those working with x-ray machines to avoid personal injury. The trial ended with a neighbor, Ms. Thelma Benjamin, testifying on rebuttal about the DEQ and Exxon failing to test her property or the property of others in the neighborhood. Plaintiffs' counsel likened the harm suffered by the Grefers with damages caused in the 1989 EXXON-VALDEZ oil spill. Much of this evidence was irrelevant and, more than likely, confused the jury, contributing to its exorbitant punitive damage award.[26]
The plaintiffs also put on substantial evidence regarding Exxon's wealth. The jury heard that Exxon is the largest corporation in the world and had assets of $251 billion; that its revenue for the year 2000 was $228.439 billion; and that its total net worth in 2000 was $173 billion. In addition, evidence was presented of the salaries, bonuses, stock options, etc., of Exxon's corporate executives. The jury heard that the only way to punish a big corporation like Exxon for its reprehensible behavior was to hit its bank account. Plaintiffs' counsel stated that Exxon could satisfy a large punitive judgment in very little time with the interest that accrues on its $72 billion in shareholders' equity and that it likely would never feel the effect of the judgment because it would be passed on to the consumers at the gas pumps. Counsel also pointed out that Exxon recently had been cast in judgment for several other large punitive damage awards, including a case in which an Alabama jury awarded the plaintiffs punitive damages of $3.4 billion and compensatory damages of $87 million. Such assertions bore no relationship to the harm suffered by the plaintiffs. Although the jury could consider Exxon's wealth, the company's wealth could not provide an open-ended basis for inflating the punitive award. With this in mind, we find the $1 billion dollar punitive *1151 damage award is neither reasonable nor proportionate to the amount of harm to the plaintiffs and to the general damages recovered. Considering the substantial compensatory damages awarded in this case, in our opinion a lesser single-digit ratio would be appropriate.
The third guidepost in Gore is the disparity between the punitive damages awarded and the civil penalties authorized or imposed in comparable cases. The Court in Campbell noted that criminal penalties may also be considered, as the existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action. Campbell, 538 U.S. at 428, 123 S.Ct. at 1526. When used to determine the dollar amount of the award, however, the criminal penalty has less utility. Id. Great care must be taken to avoid use of the civil process to assess criminal penalties that can be imposed only after the heightened protections of a criminal trial have been observed, including, its higher standard of proof. Id. Punitive damages are not a substitute for the criminal process, and the remote possibility of a criminal sanction does not automatically justify a punitive award. Id.
Exxon argues that it did not violate any state laws or regulations because the DEQ did not establish NORM regulations until 1989[27] and therefore the punitive damage award is not warranted. It also argues that the maximum civil penalty under Louisiana law for willful conduct would not exceed $1,000,000.00, and thus if punitive damages are imposed, the amount should not exceed $1,000,000.00.
In the case of In re New Orleans Train Car Leakage Fire Litigation, XXXX-XXXX, p. 1 (La.App. 4 Cir 6/27/01), 795 So.2d 364 (hereinafter "CSX"), we affirmed the trial court's reduction of a jury's punitive damage award from $2.5 billion to $850 million. That case involved personal injury claims by 8,047 class members for injuries arising out of a burning train car carrying a hazardous substance. In reaching our result, we recognized the large number of claimants, their personal injury, the potential that many city blocks could have been destroyed by an explosion, and the evacuation of thousands during the night because of the danger posed by burning chemicals. Like Exxon, the defendant argued in CSX that because the maximum civil penalty under Louisiana law for its violation was slightly more than $1,000,000.00 that should have been the amount of the jury's punitive award. We disagreed, noting that "the BMW Court did not select and use the term `guideposts' without reason", and that term does not "connote or suggest a cumulative series of three `tests' or `elements' which must be met." CSX, at p. 33, 795 So.2d at 386. We then specifically rejected the notion "that the third guide... `caps' punitive damages." Id. at p. 33, 795 So.2d at 386-87.
The plaintiffs point to various criminal fines for violations of Louisiana statutes and regulations and give examples in which fines of tens of thousands of dollars a day would be imposed every day for the years Exxon was in violation of the law. Notably, in Cooper, the Court rejected an effort, similar to the plaintiffs' here, to suggest that the maximum fine provided *1152 by an Oregon statute would have been imposed each time a piece of promotional literature was distributed, 532 U.S. at 442-43, 121 S.Ct. at 1689, while in Campbell the Court rejected an attempt to justify a large award based on speculation about whether, in a criminal prosecution, the defendant might have lost its business, license, been imprisoned, or been required to disgorge all profits.
The fact that Louisiana had no regulations governing NORM until 1989 does not excuse Exxon's reprehensible action. And Louisiana's maximum civil penalty for willful misconduct, alone, cannot limit a punitive damage award. Nonetheless, based on our review of the record, we find that $1 billion punitive award in this case is exorbitant and must be reduced.
In summary, we find that an application of the Gore guideposts to the facts of this case, especially in light of the substantial compensatory damages awarded, likely would justify a punitive damages award closer to the amount of compensatory damages. The punitive damage award of $1 billion, therefore, was neither reasonable nor proportionate to the wrong committed, and it was an irrational and arbitrary deprivation of Exxon's property. Therefore, we will amend the jury's award to reduce it to an amount that we have determined is both reasonable and proportionate to the amount of harm suffered by the Grefers and to the general damages of $56,145,000.00, which is $112,290,000.00 or twice the general damage award.

Interest on the Punitive Damage Award Judgment
The plaintiffs argue in their sole assignment of error on appeal that the trial court erroneously refused to attach prejudgment interest to the punitive damage award. We disagree.
In CSX, supra, we held that judicial interest may begin running on a punitive damage award no earlier than the time a court signs a judgment memorializing that award. Id. at pp. 53-54, 795 So.2d at 397-98. "Under both Louisiana and federal law, a plaintiff is entitled to interest on punitive damages only from [the] date of judgment." Jordan v. Intercontinental Bulktank Corp., 621 So.2d 1141, 1158 (La.App. 1st Cir.1993).

ITCO's Fault
In this assignment of error, ITCO argues that the jury erred in finding it five percent (5%) at fault.
Prior to the close of trial, the parties and the trial court agreed that there would be only one jury interrogatory pertaining to ITCO's liability under different theories of recovery and the trial court so instructed the jury. In effect, ITCO stipulated that a finding of "fault" could encompass liability for negligence, nuisance, strict liability, and breach of the lease agreement. ITCO specifically stipulated that a finding of fault against ITCO would be a prima facie "finding of a breach of lease for purposes of the record and the judgment and the appeal."
The jury's finding of 5% fault against ITCO is entitled to substantial deference on appeal and must be affirmed unless we find the jury was manifestly erroneous. See Stobart v. State, Through DOTD, 617 So.2d 880, 882 (La.1993). The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was reasonable. Id.
After reviewing the record, we find the jury reasonably could have found ITCO at fault for breaching its lease with the Grefers. Paragraph 14[28] of the leases provide:

*1153 Lessee shall maintain in good order and condition any buildings or other improvements it may erect on the leased premises, as well as the ground surrounding the same, and said property shall never be so used as to create nuisance.
The evidence in the record reflects that ITCO had erected at least one pipe-cleaning machine, as well as numerous roads and pipe racks, on the Grefer property. ITCO claims it did not breach the lease because it never erected any buildings on the Grefer property. Though an "improvement" is not defined in the ITCO/Grefer lease, the pipe-cleaning machine, pipe racks, and roads fall within the definition given in Black's Law Dictionary. An improvement is an "addition to real property, whether permanent or not ... that increases its value or utility." BLACK'S LAW DICTIONARY 761 (7th ed.1999). The photographs introduced into evidence depict that the pipe-cleaning machines, pipe racks, and roads are improvements. Furthermore, Mr. Hooper acknowledged that ITCO found NORM contamination in the area of the pipe racks and the cleaning machines. Testimony also reflects that ITCO used the discarded contamination scale to build roads on the property. In view of the evidence and the number of years ITCO occupied the Grefer property, we cannot say the jury erred in allocating some fault to ITCO.[29]

INDEMNITY
Exxon argues in its final assignment of error that the jury erred in finding that it must indemnify ITCO. Exxon contends that the contracts between ITCO and Exxon do not contain a contractual indemnity clause in favor of ITCO and that tort indemnity is not available since ITCO was allocated a share of the fault.
The record reflects that the jury answered affirmatively to interrogatory number 11, which read, "If you answered yes to numbers 3 and 4 and assigned a percentage to ITCO in number 7, do you find that ITCO is entitled to recover from Exxon all amounts awarded against ITCO under its counterclaim against Exxon?"
Exxon is correct that ITCO has no claim for contractual indemnity and that if this were a tort indemnity case then La. C.C. art. 1804 and the decision in Diggs v. Hood, 772 F.2d 190 (5th Cir.1985) would preclude the claim of indemnity because ITCO was found partially at fault. However, even though ITCO asserted a claim against Exxon for indemnity and/or contribution, the record reflects that ITCO's counterclaim was for a breach of duty to disclose, i.e., breach of contract.
Pursuant to Article 19 of the 1985 ITCO/Exxon contracts, Exxon assumed specific health and safety disclosure obligations. Those obligations were refined in the amendments, dated in October and November 1985, which read in pertinent part:
Exxon will make available, to Contractor, and it shall be Contractor's responsibility to review, such material safety data sheets as pertain to known toxic and hazardous substances to which Contractor's employees or subcontractors are likely to be exposed while performing any particular or individual work task on behalf of Exxon.
* * *
Exxon's contract representative or his designee and Contractor's appointed safety and health supervisors will meet on a regular basis, preferably at the beginning of each Exxon shift that Contractor *1154 is working, to determine whether any changed condition or specific health and safety hazards will be encountered during the work to be done during the shift. Additional meetings during each shift will be held if though necessary by Contractor's safety and health supervisor or Exxon's contract representative.
Clearly, these provisions imposed on Exxon a duty to disclose to ITCO any known toxic and hazardous substances to which ITCO's employees or subcontractors were likely to be exposed and to disclose whether any changed condition or specific health and safety hazards would be encountered during the work. In view of our finding that Exxon's conduct was wanton and reckless for failing to notify ITCO in a timely manner of the NORM contamination in its piping/tubulars, we find Exxon did, in fact, breach its duty to warn ITCO and that the jury did not err in finding that, based on ITCO's counterclaim against Exxon, ITCO was entitled to recover from Exxon all amounts awarded against ITCO on the plaintiffs' main demand.

CONCLUSION
Accordingly, for the reasons stated herein, the judgment of the trial court rendered in accord with the jury verdict in favor of the Grefers is amended, in part, to reduce the $1 billion award for punitive damages to $112,290,000.00 to comply with the Due Process Clause of the Fourteenth Amendment of the United States Constitution. In all other respects, the judgment is affirmed. Furthermore, the trial court judgment denying Exxon's exception of prescription is affirmed.
AMENDED AND, AS AMENDED, AFFIRMED.

ON APPLICATION FOR REHEARING
We clarify our original opinion on two points, but deny the rehearing.
The cases of Roman Catholic Church of Archdiocese of New Orleans v. Louisiana Gas Service Co., 618 So.2d 874 (La.1993) and Corbello v. Iowa Production, 02-0826 (La.2/25/03), 850 So.2d 686, cited in our original opinion, are applicable to show that there is a basis for the awarding of damages that greatly exceed the value of the property regardless of whether the claim is in tort or contract so long as a reasonable basis exists in the record to support the finding. In this case, the jury was presented with several estimates evidencing the cost to remediate the Grefer tract, including the $46,000.00 figure advanced by Exxon, Mr. Cargill's estimate of $1,387,310.00, which is closest to the actual market value of the property, and Mr. Waligora's estimate of $82,000,000.00. The jury awarded restoration damages of $56,000,000.00, an amount between the two highest estimates. Because there is a reasonable basis in the record to support the jury's finding, we cannot say the jury was clearly wrong in awarding that amount.
With respect to exemplary damages, Exxon argues, citing State Farm Mutual Automobile Ins. Co. v. Campbell, 538 U.S. 408, 425, 123 S.Ct. 1513, 1524, 155 L.Ed.2d 585 (2003), that the conduct that allegedly put ITCO's employees at risk has no place whatsoever in the punitive damages analysis because harm to third parties cannot be punished. This, in our view, is an incorrect and exceedingly narrow reading of Campbell. In reviewing an award of punitive/exemplary damages, we have the responsibility of looking to the callous, calculated, despicable and reprehensible conduct of Exxon during the time period in question. Even though this case is not a personal injury claim by the ITCO workers, the mindset of Exxon should be considered in deciding whether the sum awarded was appropriate. The fact that Exxon showed no regard for ITCO's workers, i.e., no concern for human *1155 safety, certainly demonstrates that it had even less concern for the property damage that it caused, thus further demonstrating the morally culpable nature of its conduct.
The jury's $1 billion exemplary damage award under any standard, pre-Campbell or post-Campbell, is manifestly erroneous. However, based upon the jury's compensatory award, the manner in which Exxon was less than forthcoming about the NORM contamination on the Grefer property/ ITCO leasehold when weighed against the size of Exxon's bureaucracy and the potential for causing mass hysteria in the community if the disclosure was made in less than a careful manner after discovery of the NORM problem, warrants an award of twice the compensatory damage award as the highest figure that a reasonable jury could award in view of Campbell.
TOBIAS, J., Concurs in the Denial of the Rehearing and Assigns Reasons.
I respectfully concur in the denial of the rehearing in order to assign additional reasons in support thereof.
In our original opinion, we discussed at some length the cases of Roman Catholic Church of Archdiocese of New Orleans v. Louisiana Gas Service Co., 618 So.2d 874 (La.1993) and Corbello v. Iowa Production, 02-0826 (La.2/25/03), 850 So.2d 686. However, we did not fully discuss the tension between them, which, in my view, makes the jury's determination of compensatory damages neither manifestly erroneous nor clearly wrong. In a supplemental application for rehearing, Exxon cites this court to Hornsby v. Bayou Jack Logging, 04-1297 (La.5/6/05), 902 So.2d 361, 2005 WL 1058888, a case decided by the Supreme Court while Exxon's application for rehearing in this case was pending before this court.
Corbello is a contract case decided by the Louisiana Supreme Court after the appeal in the case at bar was docketed in this court. Roman Catholic Church is not a pure tort case. Underlying the recovery in Roman Catholic Church is the Church's contractual obligation to the U.S. Department of Housing and Urban Development ("HUD") that required the Church to operate the property for low-income individuals for a fixed period of time, in default of which ownership of the property would revert to HUD. Thus, I find that it is reasonable to read the two cases in pari materia. Whereas, the Grefers' claims against ITCO sound in both contract and tort, their claims against Exxon are in tort.
In Roman Catholic Church, at the time of suit the Church had already expended a very substantial sum to restore the property. In context, that was reasonable. In Corbello, the plaintiff had not expended anything, yet was allowed to recover $33 million without any obligation to spend anything to restore the damaged thing. As I read Corbello, where the restoration (remediation) is contractual the restoration costs may include apparently speculative costs without an obligation to expend the money to restore, but where the remediation costs are tort based, only actual sums expended can be considered.
If the Supreme Court in Corbello read out of the contract at issue therein the word "reasonably," how can we find an award of $56 million by the jury is unreasonable?
We found that the Grefers had "both personal and economic reasons for wanting to restore their property to its original condition." We reached this conclusion, relying upon Judge Grefer's statements that (a) "he and his siblings want to restore the property, which has been in the Grefer family since 1875, to its original condition and not to the mere minimum *1156 DEQ standard"; (b) he and his siblings were "unable to sell or lease the contaminated property without exposing themselves to liability and they do not want to burden their children with this"; and (c) he expressed "grave concern about the effects the radioactive contamination might have on the neighbors and the general public." A trier of fact has the right to weigh that testimony and give it such weight as deemed appropriate.
One might assert that Judge Grefer was framing his answers to questions propounded to come within the ambit of Roman Catholic Church's personal-to-the-owner test, ignoring the language in the case referring to the "homestead", i.e., one's personal dwelling (which is not the case of the Grefers). But again, this falls to the trier of fact to weigh and evaluate.
In my view, the Supreme Court's standards for recovery must be understood in the context of the whole body of the law respecting recovery of damages. Among these are the doctrine of waste and the reasonable person. How can we conclude in light of the damage award in Corbello ($33 million to remediate a property having a value of $108,000) that the $56 million award is unreasonable? One might argue that the Grefers will remediate the property down to levels that make it commercially viable and usable, i.e., levels within the guidelines of the Louisiana DEQ and/or levels that will satisfy a financial institution that it can safely lend money on the property without the exposure of having to remediate the property at substantial cost should the property come into the financial institution's ownership by virtue of foreclosure. But is that difference in dollars not a justified award? The plaintiffs will likely expend substantial sums in defense of third party claims and responding to any awards of damages.
Hornsby is distinguishable on its facts. The case addresses damages for the improper cutting of trees, where a special statute specified what damages were recoverable and the penalties associated therewith. In my view, a material difference exists between cutting of trees and contamination from radioactivity. A landowner can sell his property without trees on it, and the value of the land may be reduced because of the absence of the trees. However, land contaminated with radioactivity at a level which makes the land unmarketable or undevelopable because no financing entity will loan money thereon as discussed above, is something that is certainly very personal to the owner when the contamination is caused by a third person. Thus, Judge Grefer's testimony to the effect that he and his family are unable to sell or lease the contaminated property without exposing themselves to liability is something that comes within the ambit of something personal to the owner. Superimpose on this that, unlike Roman Catholic Church where the Church had the financial resources to repair the damage, the Grefers are apparently without the financial resources to remediate their property without first recovering the funds to do so. Is not the jury's determination in this case reasonably within their discretion?
Finally, although some of the NORM was deposited upon the Grefers' property prior to the enactment of La. C.C. art. 2315.3, without doubt some of the NORM was deposited after the amendment to the Civil Code. Additional injury occurred to the Grefers after 1984 and the jury was within their discretion to determine that one could not remediate the pre-1984 contamination without remediating the post-1983 remediation.
NOTES
[1] The plaintiffs' original petition refers to Rose Marie Grefer Haase as Rose Marie Grefer Hassi.
[2] The immovable property at issue was part of a larger tract of land purchased by the plaintiffs' great grandfather in 1875 and since then has remained in the Grefer family. The plaintiffs acquired the naked ownership of three-fourths (3/4ths) of the immovable property in February 1945 upon the death of their father, Archibald J. Grefer, Sr., and full ownership of the entire tract in March 1996 upon the death of their mother, Camille Claire Antoine Grefer.
[3] Half-life is the time required for half of the atoms of a radioactive substance to decay. No two substances have the same half-life. For example, uranium-238 has a half-life of approximately .5 billion years; thorium234 has a half-life of 24 days; and tellurium has a half-life of 4.2 minutes. Nearly all decay products are themselves radioactive, giving rise to decay chains that eventually end in a stable nuclide.
[4] "NORM" is the acronym for Naturally Occurring Radioactive Material.
[5] The UKOOA NORM safety guidelines covered the transportation and disposal of contaminated equipment, training of personnel, and the use of qualified and experienced de-scaling contractors. The NORM Reference Manual outlined the systematic approach oil companies were to follow to identify wells with radioactive scale.
[6] Under certain conditions, the levels of radiation caused by the radium in scale exceed the normal background levels of radiation from the earth and the sun, to which everyone is exposed.
[7] Three types of radiation measurement acronyms are important to an understanding of this case. The first is microentgens per hour (uR/hr), which is the reading one would get from a geiger-type counter or survey meter, measuring the amount of radiation in the air at any specific point. See, James R. Cox, Naturally Occurring Radioactive Materials in the Oil Field: Changing the NORM, 67 Tul. L.R. 1197 (1993), note 6 at 1202. This less thorough measurement may be taken anywhere in the field and is known as an external dose rate. Id. The second measurement is picoCuries per gram (pCi/g), which measures the radioactivity of solid media such as soil or scale, and this test must be performed with sophisticated laboratory techniques. Id. at 1201. The third measurement is millirems (mR), which concerns the dose of radiation to the body. Id. at 1202.
[8] The Grefer property is a continuous tract of land measuring 1,426,500 square feet, or approximately 33 acres, that runs from 16th Street to Breaux Avenue and from Peters Road to Pailet Avenue in Harvey, Louisiana. The leased tracts are referred to as G-1 through G-4 and G-6 through G-9; there was no G-5 lease.
[9] Daniel Lund, P.L.C., is a partner in the Law Offices of Montgomery, Barnett, Brown, Read, Hammond & Mintz.
[10] Alpha Technical, an oilfield service company, also had leased property from the Grefers.
[11] The plaintiffs' use the acronym TERM to refer to the radioactive scale deposits found in the used oilfield tubulars. The defendants, on the other hand, refer to the deposits as NORM. As mentioned, infra, the radioactive scale consists of radium-226, radium-228, and their daughter products. To the extent radium is found in used oilfield tubulars, it is naturally occurring and may be technologically enhanced. It is sometimes referred to as Technologically Enhanced Naturally Occurring Radioactive Material ("TENORM"), which is defined as "natural sources of radiation which would not normally appear without some technological activity not expressly designed to produce radiation." LAC33:XV.1417.A.1.
[12] ITCO also had filed a third party demand against OFS, Inc. and Oilfield Testers, Inc., alleging that these two licensed NORM handling facilities conducted operations near or adjacent to the Grefer tract that resulted in NORM contamination to the property.
[13] Exxon had subpoenaed both Mr. Haase and Omer F. Kuebel, Jr., another attorney from the Montgomery Barnett law firm, to testify but the trial court quashed the subpoenas because Exxon failed to list them as witnesses on the pre-trial witness list. As a result, Exxon was precluded from calling them as witnesses at the prescription hearing. Nonetheless, the trial court allowed Exxon to proffer statements that it believed Mr. Haase would have testified to if he had been allowed to testify. The proffered testimony provided that Mr. Haase had represented ITCO in several matters during his employment with the Montgomery Barnett law firm, including assisting ITCO in NORM related matters and negotiations with Exxon regarding the remediation of ITCO's upper yard; despite his knowledge of the radioactive contamination on the property, he did not inform his family that it might have contaminated their adjacentland.
[14] Mr. Lund executed an affidavit on November 28, 2000 that ITCO submitted in support of its motion for summary judgment and exception of prescription filed in December 2000. In the affidavit Mr. Lund averred that in 1992 during negotiations with Judge Grefer regarding the cancellation of the ITCO lease, Judge Grefer expressed concern about radiation on the property and asked him to include a reservation of rights clause in the termination agreement. After the trial court denied the motion for summary judgment, ITCO abandoned its exception of prescription.
[15] At a January 3, 2001 deposition, Judge Grefer testified that Mr. Haase told him to call Mr. Michael Hooper because "`there may be a problem with the property.'" When asked whether or not Mr. Haase had told him there was a potential problem with radiation on the property, Judge Grefer replied, "I don't recall." Likewise, when asked whether the word "`radiation'" was ever used in his conversation with Mr. Michael Hooper, Judge Grefer again replied, "I don't recall." At a January 29, 2001 deposition, when questioned by Exxon's counsel about his conversations with Mr. Lund regarding the release for ITCO and whether there was a potential for environmental contamination on his family's property, Judge Grefer stated, unequivocally, "No, I had no conversation with Dan Lund about environmental contamination on the property." Exxon's counsel then asked, "But just to make sure I understand, it's not that you don't recall the conversation? You know you didn't have one?" Judge Grefer again responded, "I didn't have one."
[16] The exhibits attached to Mr. Lund's deposition included correspondence and notes from Mr. Lund's ITCO file, which the plaintiffs obtained through discovery. Mr. Lund identified two handwritten notations that he had made at the time he spoke to Judge Grefer. The first notation, which appears on a copy of the June 19, 1992 cover letter that Mr. Kuebel wrote to Judge Grefer advising him to review an attached draft of the revised settlement agreement, read "6/30Tel Joeis Holding the Check what about environmental." Mr. Lund explained that the notation, made on June 30, 1992, indicated that he had telephoned Judge Grefer, who was holding ITCO's check and was inquiring about environmental conditions on the property. The second handwritten notation, Mr. Lund explained, was made during a telephone conversation with Judge Grefer on July 2, 1992 and read "Telephone Joe Grefer, 10:00 a.m., told Joesays he's concerned about radiation, put in agreement. No indication at this time. This is not intended to release or waive any rights against any party who may have responsibility."
[17] Mr. Michael Hooper did not testify at trial but the parties stipulated that had he testified his testimony would have been the same as Mr. John Hooper's testimony. Mr. John Hooper testified at trial that after Exxon disclosed the NORM problem to ITCO in March 1987, ITCO discontinued the cleaning of any used piping/tubulars that were above the safe threshold. He further testified that ITCO surveyed its yard, including the Grefer tract, to determine if there were any elevated NORM readings on site. Piping/tubulars found in pipe racks that had elevated levels of radioactivity were moved to a segregated area in ITCO's lower yard. According to Mr. Hooper, the ITCO yard did not register above background levels with the exception of two areas, one outside an inspection shed and the other where the pipe-cleaning machine was situated on the Grefer property. Mr. Randy Minton, ITCO's radioactive safety officer, reported those areas presented no hazards since the primary safety concern discussed by Exxon with ITCO was the airborne dust which could be ingested by workers. Mr. Hooper testified that ITCO never knowingly cleaned any NORM contaminated pipe after March 27, 1987, and that when he transferred the property back to Mrs. Grefer in mid-1992, he was not aware of any unacceptable levels of radioactive scale on the property.
[18] Mr. Lund initially made the sworn statement in his affidavit in November 2000, which ITCO submitted in support of its motion for summary judgment and exception of prescription. At that time, ITCO was making the same argument that Exxon made at the post-trial prescription hearing and asserts in this appeal, i.e., Judge Grefer knew or should have known by exercising reasonable diligence that the property was contaminated and that the defendants were responsible. Mr. Lund's statement certainly was not against his client's interest; rather it reinforced ITCO's claim that Judge Grefer had knowledge sufficient to commence the running of prescription in July 1992. In any event, whether or not the statement was against ITCO's interest is not germane to the issue at hand.
[19] The original jury poll transcript of May 22, 2001 refers to Mr. Ferbos as "Mr. Provost" and the amended transcript of May 22, 2001 refers to him as "Mr. Ferbost."
[20] Ms. Bui is referred to as "Hu Yong Wi" and "Ms. Wei" in the jury polling transcript, the amended transcript and in the trial court judgment correcting the record.
[21] Interrogatory numbers 12 and 13 pertained to whether or not Exxon was responsible for punitive damages and, if so, the amount thereof. Ten jurors voted to award the plaintiffs punitive damages but only nine agreed to the one billion dollar amount. The inconsistencies arose because two jurors, Ms. Denise Green and Mrs. Lois Washington, voted to award punitive damages but did not agree with the amount while one juror, Mr. Anthony Green, voted not to award punitive damages yet agreed to the one billion dollar amount.
[22] The record reflects that first, five jurors are recorded as having answered "no" to interrogatory number 2 (not one, as the trial court recollected); second, juror number 2, Ms. Sam, answered "yes" to interrogatory numbers 3,4, 5 and 6 (and not "no" on every question); and third, it was defense counsel (not plaintiffs' counsel) who stopped the court on a particular question when the number of votes was not sufficient on interrogatory number 9.
[23] The proffered evidence indicates that Mr. Catalano and Mr. Newman returned to the courtroom on March 18, 2002 to listen to the original tapes, using a Macintosh computer to enhance the sound. The enhanced audiotape disclosed that Mr. Ferbos' answer to interrogatory number 2 was "yes" and Mr. Catalano amended the jury transcript accordingly. Mr. Talbot later obtained an audio file of the original recording from Mr. Newman and, at his request, used a broadband noise reduction computer program to "filter" or eliminate the background noise to better hear the recorded voices. After listening to the original audio file, both filtered and unfiltered, he determined that Mr. Ferbos and Ms. Bui both answered "yes" to the second interrogatory. Mr. Odom, listened to the same audio files using a wave frequency analysis software program and concluded that on interrogatory number 2 there were five "yes" votes, three "no" votes, and the remaining four votes were indistinguishable. In view of the fact that Mr. Catalano had Mr. Newman enhance the original audiotapes without counsel present and Mr. Ferbos' testified nearly a year after the jury was polled, the trial court did not abuse her discretion in excluding the proffered testimony, copy of the amended transcript, and affidavits into evidence.
[24] The Louisiana limit for unrestricted use of sites containing TENORM is five picocuries per gram (5 pCi/gm) above background of radium-226 or radium-228. LAC33:XV.1417.A.1.
[25] In Walls, the Supreme Court addressed the issue of whether the Workers' Compensation Act, specifically La. R.S. 23:1032 as amended in 1976, which extends tort immunity to executive officers, barred a wrongful death action against the executive officers when the decedent's occupational exposures occurred entirely before the statute was amended, but the death from silicosis did not occur until years after the amendment's effective date. The Court held that applying the 1976 amendment to silicosis exposure that predated the statute, resulting in death after the effective date of the statute, did not result in an impermissible retroactive application of the law.
[26] The record reflects that during jury deliberations, the foreperson sent a note to the trial court inquiring as to whether any of the punitive damage award would go to compensate the people in the community. After discussions with counsel, the trial court instructed the jury that the entire punitive award would go only to the Grefers.
[27] The DEQ first established NORM regulations by emergency rule in February 1989, by amending the Louisiana Radiation Regulations to add Chapter 14, titled "Regulation and Licensing of Naturally Occurring Radioactive Material (NORM)." See La. Reg. 71-72 (2/20/89); LAC 33:XV.1401. et seq. Those regulations apply to soil contaminated with NORM, as well as waste management, transfer, and disposal with regard to sites and facilities involved in storage and/or cleaning of tubulars and contaminated equipment. LAC:XV.1402.
[28] This provision appears as paragraph 15 in two of the leases.
[29] Considering our conclusion that ITCO breached its contract with the Grefers, we need not address whether ITCO's fault is based on any other theory of recovery.